UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MARA MANCINI and K. C. by his next friend and father, CLYDE CLARK, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 1:16-cv-02048-TWP-MJD ) |
| CITY OF INDIANAPOLIS, DOES 1-50, and ROE CORPORATIONS 1-10, | ) ) ) |
| Defendants. | ) |

## ENTRY ON DEFENDANTS' MOTIONS
## FOR SUMMARY JUDGMENT TO EXCLUDE EXPERT

This matter is before the Court on a Motion for Summary Judgment (Filing No. 65) filed by Defendant City of Indianapolis ("the City"). Also before the Court is the City's Motion to Exclude Testimony of Ernest Burwell, (Filing No. 75), Plaintiffs' proposed expert witness. Plaintiffs Mara Mancini ("Mancini") and her son K.C. ("K.C.") (collectively, the "Plaintiffs") filed this action alleging constitutional claims pursuant to 42 U.S.C. § 1983, as well as a *Monell* claim, follow a tragic dog bite incident. For the reasons stated below, the Court **grants** the City's Motion for Summary Judgment and **denies as moot**, the Motion to Exclude.

### I. BACKGROUND

For the most part, the material facts are not in dispute. However, as the summary judgment standard requires, the undisputed facts and any disputed evidence are presented in the light most favorable to Mancini as the non-moving party. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000). On July 16, 2015, at approximately 10:19 p.m., Indianapolis Metropolitan Police Department ("IMPD") Officer Jon King ("King") initiated a traffic stop on a car with an expired license plate. (Filing No. 66-1 at 7.) The driver, Dequarius Walker ("Walker"),

stopped and exited his car while crouching down so that King could only see the top of Walker's head. *Id.* at 10. Because Walker took a position of cover, King feared that Walker was armed. King stayed behind his car and requested backup officers over his radio and indicated he believed the suspect was armed. Walker fled into an alley. King did not follow Walker because he believed Walker was armed. Several officers arrived on the scene including Officer Greg Stewart ("Stewart"), with his canine partner Scooter. *Id.* at 11. King informed Stewart that the believed Walker was armed, and that Walker had run into the alley. ([Filing No. 66-4 at 29](#).) Since the suspect could possibly be armed and in a residential area, Stewart decided to attempt to locate the subject with his canine partner. ([Filing No. 66-2 at 5](#).) Before he deployed Scooter, Stewart made the following "loud announcements" into the alley, in both English and Spanish: "Police K-9. Come out now and surrender or I'll search [with] my dog. You may be bit." *Id.* at 30. Getting no response, Stewart returned to his patrol car to retrieve Scooter, hooked a leash onto Scooter's harness, and began tracking up the alley with Scooter on the leash. ([Filing No. 66-2 at 5](#).) King and another officer followed behind.

As they passed a backyard, Scooter began pulling Stewart back towards the yard. ([Filing No. 66-4 at 31](#).) When Stewart arrived at the yard fence line, Walker suddenly stood up. *Id.* Stewart ordered Walker to show his hands. However, Walker did not show his hands and instead fled over the fence. *Id.* at 32. As Walker fled, Stewart and Scooter ran after him in an adjacent backyard and Stewart shouted, "Stop, police, or I'll send the dog." *Id.* at 70. Again, Walker did not comply and continued to run. Knowing that Scooter was "locked onto" Walker as the target of the pursuit, Stewart dropped Scooter's leash and allowed Scooter to lead. *Id.* at 33.

Scooter was trained to apprehend only the suspect that he is targeted on and pursuing, ([Filing No. 66-2 at 2](#), [Filing No. 66-4 at 57-60](#), 62-63). He is not trained to bite the first person he

comes into contact with. (Filing No. 66-2 at 2.) Canines can be targeted to pursue a particular suspect, (Filing No. 72-1 at 23), however, they cannot be trained to differentiate between a guilty person and an innocent person and dogs have no cognitive reasoning (Filing No. 72-4 at 7-8).

As Scooter was about to apprehend him, Walker barrel-rolled over a fence into Mancini's front yard. Stewart instructed Scooter to jump over the fence, with the command "Hup, hup, hup" (Filing No. 66-4 at 33), but Scooter did not jump the fence. Walker landed on the ground inside the fenced yard. Scooter followed Walker down the fence row, on the opposite side of the picket fence. Walker ran to the back of Mancini's house, in which Mancini's dogs were barking. Scooter also made his way into Mancini's backyard by pushing through a board connecting Mancini's house and a neighbor's house. *Id.* As Scooter was pushing through the board, Walker went into the neighbor's fenced-in backyard. (Filing No. 66-4 at 34.) Stewart could tell from the barking that there were multiple dogs. He could "hear the dogs in the commotion of moving", but he could not see Scooter, Walker, or what was going on anymore. *Id.* Therefore, Stewart began to recall Scooter to Stewart's position on the opposite side of the picket fence in the corner that Scooter had pushed through. *Id.* While recalling Scooter, Stewart could hear King yelling "Go back inside. Go back inside." *Id*.

Meanwhile, Mancini heard her dogs barking in her back yard and went outside on her porch, because she thought another dog had possibly entered her yard and was fighting her dogs. (Filing No. 66-6 at 32.) Mancini observed Scooter next to her porch, but mistakenly believed it was her dog, who is a German shepherd mix and the same color as Scooter. (Filing No. 72-2 at 11.) When she came outside, simultaneously (or within seconds) of hearing King yelling for her "go back inside", Scooter jumped onto Mancini. *Id.* at 12. Mancini recalls that Scooter was "already jumping at me by the time I heard them tell me to go back into the house." (Filing No.

3

72-1.) Scooter bit Mancini's arm initially while dragging her to the ground, and then bit her leg once she was on the ground[1]. *Id.* at 12-13. Mancini believes the mauling lasted no more than 15-20 seconds, (Filing No. 72-2 at 12), and Stewart testified that all events occurred in "less than a minute, in seconds". (Filing No. 66-4 at 66.) Stewart reached Mancini and grabbed Scooter by his harness, pulling him up. *Id.* at 51. Scooter released the bite as Stewart began to lift him up by his harness.

Mancini does not remember how Scooter disengaged, but she remembers police officers coming to her aid and providing care. (Filing No. 72-2 at 12-14.) King also injured his arm when he smashed through Mancini's fence in an attempt to assist her. (Filing No. 66-1 at 33.) The first ambulance to arrive at the scene attended to Mancini, and the second ambulance attended to King. (Filing No. 72-2 at 16; Filing No. 66-7 at 10.)

Mancini was pregnant with K.C. at the time of the attack. She sustained extensive flesh-tearing injuries which required emergency care and surgery. (Filing No. 11 at 4-6.) Her wounds became infected and additional emergency surgery was required. The extreme stress of the injuries caused Mancini to experience complications with her pregnancy and K.C. was born one month early with signs of his mother's infection and he was addicted to the narcotics prescribed for Mancini's pain following the dog attack. *Id.* at 6.

On August 25, 2016, Plaintiffs filed an Amended Complaint alleging in Count I Fourteenth Amendment claims against IMPD, the City, several named and unnamed police officers, and former Chief of Police Rick Hite, in their individual and official capacities. Those claims were

---

[1] There is a factual dispute as to whether Scooter was actually returning to Stewart just before dragging Mancini to the ground. The City contends that once Mancini realized Scooter was not one of her dogs, she screamed, and then Scooter diverted from his recall and bit her. (Filing No. 71 at 4; Filing No. 68 at 5.) However, as summary judgment requires, the disputed evidence is considered in the light most favorable to Mancini, and the Court accept Mancini's version of what occurred.

4

**dismissed with prejudice,** but the Court allowed Count II, a *Monell* claim alleging a Fourth Amendment violation to proceed—noting in part that at the motion to dismiss stage it had to accept the allegation that an officer intentionally released Scooter to seize whomever he might come across. *See* [Filing No. 52 at 9](Filing No. 52 at 9).

## II. LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Indeed, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("these are jobs for a factfinder"); *Hemsworth*, 476 F.3d

at 490. When ruling on a summary judgment motion, a court's responsibility is to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Id*.

## III. DISCUSSION

The City contends they are entitled to summary judgment because the undisputed evidence establishes that the Plaintiffs' Fourth Amendment rights were not violated, and the *Monell* claim in Count II fails as a matter of law because Plaintiffs rely on a theory of transferred intent. The parties agree that Mancini's Fourth Amendment claims hinge on one question: was she seized? Additionally, the City moves to exclude Mancini's expert witness, Ernest Burwell ("Burwell"), from testifying at trial. (Filing No. 75.) The Court will first address the proposed disputed issues of material facts.

### A. Genuine Issues of Material Facts

Mancini argues that there are two issues of material facts in dispute: "1) [w]hether K-9 Scooter was trained to attack the first person he came across, and 2) [w]hether K-9 Scooter was being recalled at the time of the seizure." (Filing No. 71 at 15.) The City responds that the undisputed evidence forecloses both of these questions. (Filing No. 74 at 11, 13.)

#### 1. Whether Scooter was trained to attack the first person he came across

There is no evidence that disputes Stewart's testimony regarding how Scooter was trained. As Scooter's handler, Stewart participated in Scooter's training. Scooter is not trained to bite the first person he comes into contact with, rather he is trained to apprehend only the suspect that he is targeted on and pursuing (Filing No. 66-2 at 2). On July 16, 2015, Walker "was the *only* person Stewart expected Scooter to contact because Scooter is trained to apprehend the person he is targeted on and nobody else." (Filing No. 74 at 11) (emphasis in original). The City is correct that Stewart's expectation that Walker would be the first person Scooter contacted is not evidence

that Scooter is trained to attack whomever he came across. It is undisputed that Scooter was unleashed to apprehend Walker—an intentional deployment.

Mancini contends that Scooter being trained and commanded to seize a person is sufficient to constitute a Fourth Amendment seizure of her person.

> Q: And when you released Scooter, did you intend for him to apprehend, you know the first human he contacted?
> A: (Officer Stewart): I expected him to get Mr. Walker when he was locked on to here [sic], yes.
> Q: And did you believe that Mr. Walker would be the first human that Scooter contacted?
> A: Yes.

([Filing No. 72-1 at 27](#).) Mancini argues there is a genuine issue of material fact regarding whether Scooter was trained to attack the first person he comes across, because canines cannot be trained to differentiate between apprehending a guilty person and an innocent person. Mancini points to the City's expert witness, Sergeant Craig Patton's testimony that dogs don't have cognitive reasoning ([Filing No. 72-4 at 8](#)). However, nothing in Patton's testimony supports Mancini's claim that Scooter was actually trained to attack whomever he came across. The unambiguous evidence confirms that IMPD does not train and deploy police dogs to attack whomever they happen to encounter, and Stewart's testimony confirms that Scooter was not trained to attack the first person he comes across. Drawing all reasonable inferences in favor of Mancini as the nonmoving party, the Court finds no genuine issue of material fact regarding whether Scooter was actually trained to attack the first person he encountered.

### 2. **Whether Scooter was being recalled at the time Mancini was attacked**

The City contends that Stewart was recalling Scooter at the time Mancini stepped outside, and thus Scooter was not being deployed to apprehend *anyone* when the alleged seizure occurred. ([Filing No. 68](#) at19.) It is undisputed that Mancini, King, and Stewart are the three people that

7

witnessed the incident on the night in question. Mancini points out that while she and King testified and recalled hearing Stewart and King telling Mancini to "go back inside", Stewart is the only witness with the recollection that he was verbally recalling Scooter as well. ([Filing No. 72-5 at 10-11](); [Filing No. 72-2 at 5]().) Mancini argues that based on these differing testimonies, a jury could reasonably conclude that Stewart was not recalling Scooter when he attacked Mancini.

The City argues that neither King nor Mancini specifically contradicted Stewart's testimony that he was recalling Scooter both before and after Mancini stepped outside. However, at the summary judgment stage, the Court will accept as true that Scooter was not being recalled at the time of the attack and that the officers' instructions for Mancini to "go back inside" occurred simultaneously with Scooter's attack on Mancini. Regardless, the disputed evidence of whether Scooter was being recalled when he attacked Mancini is not material for purposes of determining summary judgment. As explained below, the undisputed evidence confirms that Stewart never directed any force at Mancini; rather she was an unintended bystander, and there was no Fourth Amendment seizure.

### B. Fourth Amendment Claim

The Fourth Amendment provides the right to be secure against unreasonable searches and seizures. The primary point of contention between the parties regarding Plaintiffs' Fourth Amendment claim surrounds the meaning of the words "through means intentionally applied" as defined by the United States Supreme Court in *Brower v. Cty. of Inyo*, 489 U.S. 593 (1989). The City contends that Plaintiffs fail to state a claim for unreasonable seizure because Mancini was never "seized". The City argues that one is seized under the meaning of the Fourth Amendment where an actor directs an action at a specific person, that is, where the actor intends the resulting

consequence. In contrast, Mancini advances the interpretation that "intentionally applied" refers to a volitional act directed at any person.

> Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an *unintended* person or thing is the object of the detention or taking. . .but the detention or taking itself must be willful. This is implicit in the word "seizure," which can hardly be applied to an unknowing act.

*Brower* at 596 (emphasis added). The City contends Mancini was unintentionally injured, as a bystander, and that "unintended injuries are the stuff of state tort laws, not federal constitutional law." (Filing No. 68 at 8.) Relying on *Brower*, Mancini responds that she is asking the Court for relief under Constitutional law, and "not asking the Court to superimpose a claim under the Constitution on what is really a tort claim." (Filing No. 71 at 6.)

*Brower* distinguished between two scenarios where a parked and unoccupied police car slips its brake and pins a passerby against a wall and a police car that pulled alongside a fleeing car, sideswiped it, and produced a crash. *Brower* at 596. In both scenarios, the results were unintended, however, in the latter scenario, a seizure occurred when the police officer intentionally sideswiped the car, which effectively terminated the fleeing car resulting in a seizure. *Id.* As was briefed extensively in the City's Motion to Dismiss, it is undisputed that Mancini was an innocent bystander, and the officers were in pursuit of Walker on the night in question. (Filing No. 52.) The primary point of contention between the parties is a legal definition of *Brower's* holding on the words and interpretation of the phrase "through means intentionally applied."

> It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*.

9

*Brower,* 489 U.S. at 596–97(emphasis added). Relying on *Brower*, this Court previously acknowledged that seizure results from intentional actions.

> The Supreme Court in *Brower* explained under what circumstances the government's termination of freedom of movement would be construed to be "through means intentionally applied." *Brower* distinguished between two scenarios where a parked and unoccupied police car slips its brake and pins a passerby against a wall and a police car that pulled alongside a fleeing car, sideswiped it, and produced a crash. In both scenarios, the results were unintended, however, in the latter scenario, a seizure occurred when the police officer intentionally sideswiped the car, which effectively terminated the fleeing car resulting in a seizure.

(Filing No. 52 at 8) (citations omitted).

> We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result. It was enough here, therefore, that, according to the allegations of the complaint, Brower was meant to be stopped by the physical obstacle of the roadblock – and that he was so stopped.

*Id.* (quoting *Brower* at 599).

The Seventh Circuit's decision in *Bublitz v. Cottey,* 327 F.3d 485 (7th Cir. 2003), forecloses Mancini's theory. *Bublitz* involved a high-speed chase of a fleeing armed robber that ended tragically "[w]hen police officers attempted to stop a fleeing armed robber by using a tire-deflation device, [and after the suspect's car drove over the spikes, it] veered across the highway, colliding with the minivan in which the Bublitz family was riding. The crash killed Mrs. Bublitz and son Nathaniel." *Id*. at 486. The court found no Fourth Amendment seizure in *Bublitz* because the police intended to stop the suspect using the tire deflation spikes, and there was no intent to stop him by means of some subsequent collision. *Id*. at 489. In ruling on the City's Motion to Dismiss, this Court found that *Bublitz* was distinguishable from the case at bar and not inconsistent with *Brower* because the Seventh Circuit's holding that the police did not seize plaintiffs was based on the fact that the plaintiffs were hit by a suspect's vehicle. (Filing No. 52 at 8.) Although the suspect's vehicle crashed into the plaintiffs' vehicle due to the officers' intentional deployment of

10

a spike system to end a high speed chase, the plaintiffs were seized by a different instrumentality than that which the officers had intentionally deployed. The Seventh Circuit termed the plaintiffs' argument as "a kind of transferred-intent argument." *Bublitz,* 327 F.3d at 489.

> The police officers involved in the high-speed pursuit of Kevin James did not intentionally apply *any* means in an attempt to terminate the freedom of movement of the Bublitz family – the unfortunate collision between James and the Bublitzes was not a means intended by police to stop the family, but rather an unintended consequence of an attempt to seize James.

*Bublitz,* 327 F.3d at 489 (emphasis in original). The City contends that "[w]hether the fleeing suspect's car hit the tire-deflation device then hit the Bublitzes' car or whether the tire-deflation device hit the Bublitzes' [sic] directly was immaterial to the transferred-intent argument." ([Filing No. 74 at 5](#).) However, as noted previously, the Seventh Circuit explicitly held that the police officers did not apply *any* means to terminate the Bublitzes' freedom of movement; rather it was the subsequent collision caused by the fleeing suspect's car that terminated the Bublitzes' freedom of movement. *Id.* at 489. Thus, the fact that it was the fleeing suspect's car instead that hit the Bublitzes was material.

The City contends that the dispositive question is whether Mancini was the intended object of the officer's force contending that bystander theories have been rejected as transferred-intent arguments by numerous courts, including the *Bublitz* court. The parties do not dispute that a bystander fits squarely under the category of an unintended person. The court agrees that Mancini misreads *Brower*, and that the *Brower* court was necessarily referring to mistaken-identity cases. ([Filing No. 74 at 3](#).) That Stewart released Scooter intending to seize the fleeing suspect does **not** mean that the officers intended to seize any other person—just as in *Bublitz*, the officer's decision to set up a spike strip did not mean that the officer intended to seize just any driver that happened

11

to drive by. *Bublitz* specifically rejected the broad reading of "intentionally applied" advanced by Mancini. Rather, "intentionally applied" requires the intent to restrain a particular person.

Mancini relies not only on *Brower*, but also *McKay v. City of Hayward,* as cases which considered facts similar to the case at hand in the context of a police dog biting an innocent bystander when the police officers were in pursuit of a suspect who fled after a traffic violation. 949 F. Supp.2d 971, 979 (N.D. Cal. 2013). In *McKay*, although an innocent bystander was bitten, the court held that a seizure did occur. *Id.* ("That [the plaintiff] was not the robber or the target of the search does not matter. What creates the seizure is the government's—here the [police department and police dog handler] in particular—intentional deployment of a police dog trained to track and bite a person."). The City notes persuasively that the Ninth Circuit has since rejected a bystander cause of action, espoused in *McKay*, by pointing to the decision in *Gangstee v. County of Sacramento,* affirming a district court's grant of summary judgment to defendants. 567 Fed.Appx. 500, 501 (9th Cir. 2014). (Filing No. 74 at 7.)

*Gangstee* is a bystander dog bite case holding that a plaintiff bitten by a police canine can maintain a claim under the Fourth Amendment only if she was the intended object of the force. Mancini attempts to distinguish the facts in *Gangstee* from her case by arguing that the police officer in *Gangstee* did not deploy the canine, rather the canine "got away from his handler". (Filing No. 71 at 12.) In *Gangstee*, the plaintiff, an innocent bystander, was bitten by a police dog when the police handler removed his dog from his car without a leash. The plaintiff noticed her son in the vicinity of the police and ran outside towards her son. The unleashed canine chased after the plaintiff and bit her, until the canine officer reached the plaintiff releasing her. The court first noted "police-dog cases, though, require a special breed of analysis. Once deployed, a police-dog is generally unable to discriminate between suspects and innocent parties and is generally

12

trained to bite whomever it encounters, facts suggesting the officer's intention to seize whomever the dog ultimately does encounter." *Id.* at *5. The police officer, as well as the plaintiff's witnesses, declared that the police officer did not give any commands to the canine prior to the canine chasing Gangstee. Because there was no command given to the canine, the court held that having the dog unleashed outside of the car, was insufficient for intentional deployment, and thus plaintiff's Fourth Amendment claim could not survive summary judgment. *Id.* at *7.

*Peterson v. City of Federal Way,* 2007 WL 2110336, at *1 (W.D. Wash. July 18, 2007), also involved an innocent bystander bitten by a police canine when an officer used the canine to track a suspect through a residential area. The court held that because indisputably the wrong person was seized, no seizure occurred under the Fourth Amendment. *Id.* at *4. As noted previously, consistent with *Brower*, unintended persons may be the object of a seizure, so long as the act is intentional. *Brower*, 489 U.S. at 596–97.

The City also cites *Warfield v. City of Chicago*, a case involving an innocent bystander that was hit by an officer's bullet as the officers pursued a fleeing suspect in the bystander's vicinity. 565 F.Supp.2d 948 (N.D. Ill. 2008). The district court rejected the transferred-intent argument and held that no seizure had occurred. *Id.* at 963-64. The City also cites several other bystander-bullet cases in which courts have held no Fourth Amendment seizures occurred. ([Filing No. 68 at 12-14](#).) Mancini responds that these cases "should be distinguished for the simple reason that a bullet – which generally follows a predictable trajectory – is not the same thing as a dog." ([Filing No. 71 at 12](#).) The Court is not persuaded by this argument and Mancini offers no authority to support her contention.

Mancini argues that this is not a transferred-intent case. ([Filing No. 71 at 11](#)) ("[T]he IMPD intended to stop a person using K-9 Scooter, and that is what happened."). However, transferred

13

intent is precisely the basis of Mancini's argument. As noted by the City, "the many cases rejecting transferred intent in the police-canine context are directly on point and belie the plaintiffs' claim that some special constitutional rule applies in dog-bite cases". ([Filing No. 74 at 9](#).) This case is no longer before the Court solely on the pleadings. The undisputed evidence is that Mancini was not the intended object of the officers' efforts to seize the fleeing suspect. Stewart's release of Scooter, intending to seize the fleeing suspect does not mean that the officers intended to seize any other person—just as in *Bublitz*, the officer's decision to set up a spike strip did not mean that the officer intended to seize just any driver that happened to drive by. *Bublitz* specifically rejected the broad reading of "intentionally applied" advanced by Plaintiffs. There are a plethora of cases which confirm that "intentionally applied" requires the intent to restrain a particular person. Accordingly, the Court finds that no seizure occurred and summary judgment is **granted** on the Fourth Amendment claim.

**C.** *Monell* **Claim**

Mancini alleges her unreasonable seizure claim under the Fourth Amendment against the City pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). An "underlying constitutional injury is a necessary element of a *Monell* claim." ([Filing No. 68 at 9](#)) (quoting *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016)).

> Therefore, a 'municipality is only responsible for its employees' actions if taken pursuant to an unconstitutional policy or custom of the municipality itself' or when a 'valid policy is unconstitutionally applied by a municipal employee' who has not been adequately trained and the constitutional wrong has been caused by that failure to train.

*Roddy v. Canine Officer*, 293 F. Supp. 2d 906, 914 (S.D. Ind. 2003) (quoting *Garrison v. Burke*, 165 F.3d 565, 571 (7th Cir. 1991)). Because summary judgment is appropriate on Mancini's Fourth Amendment claim her *Monell* claim also necessarily fails because there is no underlying

constitutional injury. ([Filing No. 68 at 9](#).) Accordingly, summary judgment is granted on the *Monell* claim.

**D.      Motion to Exclude Expert from Testifying at Trial**

The City moves to exclude Mancini's expert witness, Ernest Burwell, contending that he lacks the requisite credentials to offer expert testimony and that his testimony does not comply with Rules 401, 403, 702, and 704 (b).  Because summary judgment has been granted, this Motion ([Filing No. 75](#).) is **denied as moot**.

**E.      Defendants DOES 1-50 and ROE Corporations 1-10**

The only remaining defendants is this action are Doe's 1-50 and Roe Corporations 1-10. Under federal law, a plaintiff may name a fictitious defendant and utilize discovery to learn the defendant's proper identity. Although there is no prohibition on filing suit against unknown defendants, "John Doe defendants must be identified and served within 120 days of the commencement of the action against them." *Aviles v. Village of Bedford Park*, 160 F.R.D. 565, 567 (N.D.Ill.1995); see also Fed.R.Civ.P. 4(m) ("If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant...."). See *Redd v. Dougherty*, 578 F.Supp.2d 1042, 1048 (N.D. ILL. 2008).

Plaintiff's filed their Complaint on July 29, 2016. More than 120 days have passed since the filing of Plaintiff's Complaint, and the unknown defendants have not been identified or served. Accordingly, the Doe and Roe defendants are **dismissed** without prejudice.

**IV.  CONCLUSION**

Mancini and her son K.C., suffered horrendous injuries and a grievous lack of discretion by the officers; however, a grievous lack of discretion does not suffice to state a constitutional

15

cause of action under binding Seventh Circuit precedent. For the foregoing reasons, the Court **GRANTS** the City's Motion for Summary Judgment ([Filing No. 65](#)) and the City's Motion to Exclude Expert Testimony of Ernest Burwell ([Filing No. 75](#)) is **DENIED as moot.** Moreover the claims against defendants' Does 1-50 and Roe Corporations 1-10 are **dismissed** without prejudice.

Final judgment will be issued in a separate document.

**SO ORDERED.**

Date: 9/28/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jessica A. Wegg
SAEED & LITTLE LLP
jessica@sllawfirm.com

Jonathan Charles Little
SAEED & LITTLE, LLP
jon@sllawfirm.com

David E. Miller
SAEED & LITTLE
david@sllawfirm.com

Thomas J.O. Moore
OFFICE OF CORPORATION COUNSEL
thomas.moore@indy.gov

Donald Eugene Morgan
OFFICE OF CORPORATION COUNSEL
donald.morgan@indy.gov

Adam Scott Willfond
OFFICE OF CORPORATION COUNSEL
adam.willfond@indy.gov